UNITED STATES of America

v.

Samuel PATRICK, Defendant.

No. Crim.A. 96–10047REK.

United States District Court,
D. Massachusetts.

April 28, 1998.

Paul E. Troy, Paul G. Lannon, Sherburne, Powers & Needham, Boston, MA, for Samuel Patrick, defendant.

George W. Vien, U.S. Attys. Office, Boston, MA, for U.S.

### Memorandum and Order

KEETON, District Judge.

#### I. Background

Samuel Patrick is scheduled to go to trial on numerous charges related to conspiring to

distribute cocaine base. Count 21 of the Fourth Superceding Indictment (Docket No. 261) charges defendant Patrick with, among other things, possession and distribution of cocaine base on July 9, 1996. This alleged transaction is also listed as a racketeering act in Counts 1 and 2 of the Fourth Superceding Indictment. *Id.*

The government has indicated that it plans to present at trial a series of tape recordings of drug transactions. According to the government's representations, a consensual tape recording, identified as N–41, captures an oral agreement by defendant Patrick to sell to an informant, known as Jennifer, a quantity of crack cocaine for $800.00. For the sake of convenience, the parties have referred to, and the court will continue to refer to the male voice engaged in conversation with the confidential informant on tape N–41 as that of Samuel Patrick. The disputed portion of the recorded conversation was as follows:

Confidential Informant: Yeah. I don't got no car. Where you going to meet me?

Defendant Patrick: At the park.

Confidential Informant: How much?

Defendant Patrick: Eight-oh-oh.

Confidential Informant: All right. . . .

Defendant's Exhibit No. 102. Defendant Patrick argues that the voice on the tape recording giving a price of $800.00 for the quantity of crack cocaine is not his voice.

Defendant Patrick moved for funds to analyze tape N–41 (Docket No. 355, filed March 5, 1998). Magistrate Judge Karol allowed that motion on March 11, 1998. The Government responded by filing Government's Motion for Expert Discovery, or in the Alternative, to Prohibit Expert Testimony (Docket No. 372, filed March 20, 1998).

As a result of the analysis obtained by defendant Patrick, he filed a series of motions and supporting documents now before the court: Motion to Dismiss and Request for Expedited Hearing (Docket No. 379, filed March 30, 1998); Memorandum in Support of Motion to Dismiss (Docket No. 380, filed March 30, 1998); Affidavit of Perry Geyer in Support of Motion to Dismiss (Docket No. 381, filed March 30, 1998); Motion for the Court to Order U.S. Attorney to Conduct a Grand Jury Investigation (Docket No. 382, filed March 30, 1998); and Motion for Disclosure of Grand Jury Testimony (Docket No. 383, filed March 30, 1998).

After a hearing on the matter, the government filed a Motion to Exclude Defendant's Forensic Audio Analysis Expert (Docket No. 389, filed April 14, 1998). Defendant Patrick responded with Defendant Samuel Patrick's Opposition to the Government's Motion to Exclude Forensic Audio Analysis (Docket No. 394, filed April 21, 1998) and Defendant Samuel Patrick's Motion to Analyze Original Tape Recording N–41 and for Access to the Tape Recorder Used to Record Tape N–41 (Docket No. 395, filed April 22, 1998). The government since filed Government's Opposition to Defendant Patrick's Motion to Analyze Original Tape Recording N–41 and for Access to the Tape Recorder Used to Record Tape N–41 (Docket No. 396, filed April 24, 1998).

## II. Hearing on April 13–14, 1998

On April 13 and 14, 1998, the court held an evidentiary hearing to ascertain whether the experts retained by the defendant and the government would be allowed to testify at trial, and whether, based on the testimony of the respective experts, defendant Patrick's various motions should be allowed or denied.

During the hearing, defendant Patrick's expert, Perry Geyer testified, over the Government's objection. The Government's expert, Bruce E. Koenig also testified. Each side introduced five exhibits.

### A. Testimony of Defendant Patrick's Expert Witness

Defendant Patrick submitted the affidavit of Perry Geyer in preparation for the hearing. Mr. Geyer also testified on April, 13, 1998. In 1985, Mr. Geyer graduated from Northeastern University with a Bachelors of Science in Communications, albeit with less than stellar grades. Upon graduation Mr. Geyer began working as a MIDI (musical interface digital interface) programmer at Synchrosound. Within two years at Synchrosound, Mr. Geyer was promoted to the position of Head Engineer. Then, in 1994,

Mr. Geyer started his own company, Cybersound, Inc., which has been in operation ever since.

Mr. Geyer testified that Cybersound is a professional sound recording studio that has done work for Marky Mark, Aerosmith, and numerous corporate clients. Approximately 30 to 40% of Geyer's professional time is spent editing sound. Mr. Geyer testified that he uses a method of editing referred to as "dubbing" or "punching in." Using this method he is able to record over a portion of an existing recording.

Mr. Geyer testified that he did not know if he had the original tape, but that whether or not he had used the original, his analysis would not change. When asked to analyze tape N–41, Geyer made graphs of the waveforms of the statement "where do you want to meet me at?" and the statement "eight-oh-oh," as well as what he termed "a massive audio disruption" following the "eight-oh-oh." Mr. Geyer testified that it was his opinion that someone had taped over the original recording and "dubbed in" the words "eight-oh-oh." He stated that his opinion was based on the difference in volume, tone, and timbre between the statement "eight-oh-oh" and the rest of the sound recordings of the voice of the person identified as defendant Patrick, as well as the "audio disruption" following the "eight-oh-oh," which Mr. Geyer concluded, based on his recording experience, was the sound of a tape recorder being shut off.

At the hearing on April 13, 1998, defendant Patrick's counsel introduced a compact-disc (Defendant's Exhibit No. 104) into evidence. Mr. Geyer played this disc, containing eight different tracks, for the court. Most notable were the comparisons of the statement "eight-oh-oh" with the other samples of Mr. Patrick's voice on the tape, and the statement "eight-oh-oh" manipulated by Mr. Geyer in that the pitch was increased by 1/4 to match the pitch of the other samples of Mr. Patrick's voice. Mr. Geyer testified that the voice making the statement "eight-oh-oh" was not that of defendant Patrick. Furthermore, Mr. Geyer stated that in his opinion the statement "eight-oh-oh" could not have been defendant Patrick attempting to "pitch down" his voice, because when the statement "eight-oh-oh" was "pitched up" to match the rest of the recordings of defendant Patrick's voice, the two voices sounded different.

**B. Testimony of the Government's Expert Witness**

The government brought in an expert to refute the defendant's argument that the tape had been "dubbed." Bruce E. Koenig testified that he had worked with the Federal Bureau of Investigation (FBI) for over twenty years conducting tape authentication and voice analysis. In 1996, Mr. Koenig left the FBI and began his own private consulting business, but also maintained a working relationship with the agency. He has published numerous articles in the field, testified in hundreds of cases, and analyzed thousands of recordings. The FBI requested Mr. Koenig to analyze tape N–41, and he did so, through a combination of analyses conducted at FBI headquarters and at his private facility.

Mr. Koenig testified that tape authentication analysis could only be done on an original tape. In fact, he testified that the first step in any tape authentication analysis, is to determine whether or not the tape is an original. If the tape is not original, the analysis ends. According to Mr. Koenig the seven accepted methods of tape authentication are: (1) critical listening, (2) physical examination, (3) magnetic development, (4) wave-form analysis, (5) narrow-band spectrum analysis, (6) spectrographic analysis, and (7) other miscellaneous tests. Mr. Koenig testified that he received tape N–41 from FBI Central Headquarters on March 24, 1998, in a sealed envelope. He was not asked to conduct voice analysis, and he testified that, even if asked, he could not have done so because the tape contained an insufficient number of unique words uttered by the male voice identified as defendant Patrick.

According to Mr. Koenig, he performed six of the seven standard tape authentication tests; he did not perform any of the miscellaneous tests. He determined that the tape provided to him was indeed the original. Mr. Koenig was asked to examine Mr. Geyer's graphs submitted to the court as part of Mr.

Geyer's affidavit, Mr. Koenig testified that the graphs represented low-resolution wave-form analysis and that tape authentication could not be done solely through examination of such graphs.

Mr. Koenig stated that his analysis showed that the tape recording had been stopped and started several times at other points, but that during the disputed portion of the conversation, the recording was continuous. The government introduced a number of exhibits used by Mr. Koenig to explain his analysis and findings to the court. Using Government's Exhibit No. 4, Mr. Koenig demonstrated the appearance that a wave-form has when a tape recorder is started and stopped.

Mr. Koenig explained that a tape recorder works by using two heads: an erase head and a record-head. The erase head moves along the tape .6 seconds ahead of the record-head. Thus, during a stop in the recording, the wave-form is characterized by a spike where the record-head stops, and then a second, larger event .6 seconds later where the erase head is stopped. An example of such a "stop event" was presented to the court as the first graph of Exhibit No. 4.

Using the second graph of Exhibit No. 4, Mr. Koenig explained that when a tape recorder is stopped and re-started, the tape moves slightly, resulting in an interval of a fraction of a second between the spike where the record-head first stopped and where the record-head begins recording again. The start of the record-head is characterized by a much bigger spiked event.

After showing the wave-forms of a typical "stop-start event," Mr. Koenig discussed the third graph of Exhibit No. 4, showing the wave-form associated with the disputed part of the conversation, the statement "eight-oh-oh." Mr. Koenig testified that this part of the wave-form analysis showed no "stop-start event" before or after the "eight-oh-oh" and that the background noise, characterized by small waves, was continuous throughout the same period of time. Background noise could include any number of noises in the vicinity of the recording, including traffic, ventilation, and the power source of the recording device. Mr. Koenig testified that he

could infer from the wave-form analysis that the recording device used to make N–41 was battery operated.

The third wave-form graph did show what Mr. Geyer had earlier described as a "massive audio disruption" following the "eight-oh-oh." Mr. Koenig testified that it was his opinion that this audio disruption could be caused by any number of things including someone present bumping the tape recorder or the cellular phone from which the male voice identified as Samuel Patrick was calling.

Government's Exhibit No. 5 showed some of the results of the magnetic development testing conducted by Mr. Koenig and his associates. Mr. Koenig testified that magnetic development testing involves placing a solution on the tape that allows the taking of a photograph of the magnetic events on the tape.

In order to fully erase the tape before recording, the erase-head erases a slightly wider portion of the tape than the record-head uses to record upon. And since the erase-head moves along in front of the record-head, one is able to see a "stop event" in the magnetic development photographs, characterized by a white arch-shape where the erase-head stops, approximately an inch ahead of where the record-head stops. Given that the erase-head moves along the tape approximately .6 of a second ahead of the record-head, and the tape moves at 2 inches per second, one can expect to find the erase-head magnetic event to take place approximately 1.2 inches (give or take a few hundredths of an inch) ahead of the record-head magnetic event. Government's Exhibit No. 5 demonstrated a "stop event" where the magnetic trail left by the record-head ends approximately 1.1 inches ahead of the magnetic trail left by the erase-head.

The magnetic recording of sound onto a tape shows up in the magnetic development images as a series of vertical white lines measuring slightly less than half the width of the tape. The effect of a record-head shows on the magnetic development images as a faint white line running just beneath the line caused by the effect of the erase-head. A

stop in recording can be seen on the magnetic development images as a faint white line, caused by the record-head, ending at a white bar, while the white line caused by the erase-head continues on for approximately one inch, and ends at an arch-shape. Mr. Koenig testified that the bottom four magnetic development images on Government's Exhibit No. 5, show that during the recording of the statement "eight-oh-oh" the record-head recording was continuous and no "stop-start event" occurred.

### III. Expert Qualifications and Scientific Methodology

The Federal Rules of Evidence and the United States Supreme Court decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), guide this court's determination as to whether Mr. Perry Geyer and Mr. Bruce E. Koenig qualify as experts. Rule 702 provides that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. In *Daubert*, the Court noted that a district court must serve the role of a gatekeeper, preventing the introduction of evidence that is not relevant or is not reliable. *See Daubert*, 509 U.S. at 597, 113 S.Ct. 2786. Defendant Patrick's counsel argues that the testimony offered by his proffered expert, Mr. Geyer, is not proffered as "scientific knowledge" and therefore is not affected by the Supreme Court decision in *Daubert*. *See* Defendant Samuel Patrick's Opposition to the Government's Motion to Exclude Forensic Audio Analysis Expert (Docket No. 394 at 2).

■ Contrary to the defendant's position, I find that the questions on which opinions were being proffered by both witnesses are matters of scientific knowledge. As the testimony of the government's expert explained and demonstrated, tape authentication is a subject of scientific knowledge. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified." *See Daubert*, 509 U.S. at 593, 113 S.Ct. 2786 (citation omitted).

■ Mr. Geyer testified that the tape "sounds like" the statement "eight-oh-oh" was "punched in." Mr. Geyer generated a hypothesis (that the tape was dubbed). I assume, without deciding, that this rather particularized hypothesis qualifies as a scientific hypothesis, even though most scientific hypotheses are more generalized (e.g., all tapes having the identified characteristics of this tape were dubbed). Even if we assume that Mr. Geyer's hypothesis is compatible with scientific method, however, Mr. Geyer proffered no evidence of any testing of that hypothesis, either by himself or by anyone else. The three waveform graphs introduced as Defense Exhibit No. 101 do not test Mr. Geyer's hypothesis and do not in any way support it.

The scale on the two wave-form graphs of defendant Patrick's voice (the first and second graphs of Defendant's Exhibit No. 101) are exactly the same, but the graph of the wave-form for the statement "eight-oh-oh" is blown up. The vertical axis for the wave-form of the statement "where do you want to meet me at?" runs from $-100$ to $+100$, and the graph only takes up approximately 1/3 of a sheet of 8½ by 11 inch paper. The vertical axis for the waveform of the statement "eight-oh-oh" runs from $-30$ to $+30$, but the graph takes up the entire sheet of 8½ by 11 inch paper. Moreover, the maximum and minimum readings on both graphs are approximately around 30 and $-30$, respectively, (30 what is not clear since the axes were not labeled). Most of the maximum and minimum readings *in both graphs* appear to be in the range of 5 to 15 and $-5$ to $-15$, respectively. It is not shown that any difference would appear if both of these graphs were printed at the same magnification. This kind of manipulation of graphs cannot qualify as a scientific methodology.

Defense counsel apparently wishes the court to treat Mr. Geyer's methods and opinions as "technical" or "other specialized knowledge" under Rule 702, rather than scientific in nature. But Mr. Koenig's testimo-

ny demonstrated that tape authentication is a scientific endeavor, and is the subject of an extensive body of learning and scientific method, testing hypotheses and developing knowledge. Mr. Koenig tested the hypothesis that the tape had been dubbed (that is, recorded over), and found it contradicted by evidence. Mr. Koenig testified that none of the six tests he performed on the tape indicated any dubbing, recording over, or physical editing.

I conclude that the defense witness, Mr. Perry Geyer, is not qualified to render an opinion as to whether the tape is authentic or whether the voice making the statement "eight-oh-oh" is that of defendant Patrick. Furthermore, even if Mr. Geyer were permitted to testify as an expert, he has not presented any evidence before me that, as finder of facts in this evidentiary hearing, I am able to say supports the contention that the statement "eight-oh-oh" was added later by recording over or physical editing of the original.

## IV. Ordering the U.S. Attorneys Office to Further Investigate

Defendant Patrick urges this court to "order" the United States Attorney to "conduct a Grand Jury investigation into the alteration of Government exhibit N–41 . . . ." Defendant Samuel Patrick's Motion for the Court to Order the United States Attorney to Conduct a Grand Jury Investigation (Docket No. 382 at 1). This motion operates on the assumption that tape N–41 was altered. The defendant has failed to show by a preponderance of the evidence before the court at this time that any alteration of N–41 occurred. Accordingly, the court denies this motion, without delving into whether or not this court even has authority to grant this type of relief, by ordering an executive branch agency to conduct an investigation to try to find support for a defense hypothesis.

## V. Motion to Dismiss

Defendant Patrick also argues that dismissal of the indictment is warranted because falsified evidence has poisoned the grand jury process, and because government misconduct has deprived defendant Patrick of favorable evidence. *See* Memorandum of Law in Support of Defendant Samuel Patrick's Motion to Dismiss Indictment (Docket No. 380 at 8, 10).

■ Dismissal of an indictment is appropriate only "if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt" that the decision to indict was free from the influence of the alleged violations. *United States v. Mechanik,* 475 U.S. 66, 78, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (O'Connor concurring). Although indictments have been dismissed in several cases without a particular assessment of the prejudicial impact of the errors, the dismissals were allowed because the fundamental errors had "so compromised" the "structural protections of the grand jury" as to warrant relief. *Bank of Nova Scotia v. United States,* 487 U.S. 250, 257, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (citations omitted).

■ As explained above, defendant Patrick has failed to meet his burden of showing any misconduct by the government in this case. His request for dismissal of the indictment (Docket No. 379) must be denied.

## VI. Release of Grand Jury Testimony

Defendant Patrick requests that the testimony presented to the Grand Jury in this case be disclosed so that his counsel may determine "the extent to which falsified evidence was presented." Defendant Samuel Patrick's Motion for Disclosure of Grand Jury Testimony (Docket No. 383 at 1). The motion states that "[g]iven the serious nature of the government's misconduct and its impact on the substantive charges in the indictment, Patrick has clearly shown a particularized need for this disclosure that outweighs the interest of the public in grand jury secrecy." *Id.* at 2.

■ As explained above, defendant Patrick has failed to show any government misconduct. In these circumstances, his need for the grand jury testimony does not outweigh the public interest in the secrecy of the grand jury process. *See Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 222, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979).

## VII. Request for Access to Original Tape

Defendant Patrick argues that to conduct further analysis of tape N–41, he needs access to the original tape. *See* Defendant Samuel Patrick's Motion to Analyze Original Tape Recording N–41 and for Access to the Tape Recorder Used to Record Tape N–41 (Docket No. 395, filed April 22, 1998). But he has shown no entitlement to conduct further analysis, and allowing access to the original creates risks of impairment of the original. The interests of the public and all parties in preserving the original for availability at trial, unimpaired by previous usage, outweigh any "need" a defendant may assert to doing tests on the original during trial preparations.

### Order

For the foregoing reasons, it is hereby ORDERED:

(1) The Government's Motion for Expert Discovery, or in the Alternative, to Prohibit Expert Testimony (Docket No. 372, filed March 20, 1998) and The Government's Motion to Exclude Defendant's Forensic Audio Analysis Expert (Docket No. 389, filed April 14, 1998) are ALLOWED to the extent that Mr. Perry Geyer will not be permitted to testify as an expert on tape authentication or voice identification.

(2) The portion of Defendant Samuel Patrick's Motion to Dismiss and Request for Expedited Hearing (Docket No. 379, filed March 30, 1998) seeking a dismissal is DENIED.

(3) Defendant Samuel Patrick's Motion for the Court to Order U.S. Attorney to Conduct a Grand Jury Investigation (Docket No. 382) is DENIED.

(4) Defendant Samuel Patrick's Motion for Disclosure of Grand Jury Testimony (Docket No. 383) is DENIED.

(5) Defendant Samuel Patrick's Motion to Analyze Original Tape Recording N–41 and for Access to the Tape Recorder Used to Record Tape N–41 (Docket No. 395) is DENIED.